1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

8

9  | MICHAEL EPSTEIN, Individually and on Behalf of All Others Similarly Situated,

10 | Plaintiff,

Case No.

11 | v.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

12 | CRAY INC., STEPHEN C. KIELY, PETER J. UNGARO, SALLY G. NARODICK, DANIEL C. REGIS, DR. PRITHVIRAJ BANERJEE, CATRIONA M. FALLON, BRIAN V. TURNER, MAX L. SCHIRESON, and STEPHEN E. GOLD,

JURY TRIAL DEMANDED

13
14
15

16 | Defendants.

17

18    Plaintiff Michael Epstein ("Plaintiff"), by his undersigned attorneys, alleges upon personal

19 knowledge with respect to himself, and information and belief based upon, *inter alia*, the

20 investigation of counsel as to all other allegations herein, as follows:

21 ## **NATURE OF THE ACTION**

22    1.    This action is brought as a class action by Plaintiff on behalf of himself and the

23 other public holders of the common stock of Cray Inc. ("Cray" or the "Company") against the

24 Company and the members of the Company's board of directors (collectively, the "Board" or

25 "Individual Defendants," and, together with Cray, the "Defendants") for their violations of

26 Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

27 §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100,

28

- 1 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF
SECTIONS 14(a) AND 20(a) OF THE
SECURITIES EXCHANGE ACT OF 1934

in connection with the proposed merger (the "Proposed Transaction") between Cray and Hewlett Packard Enterprise Company ("HP").

2.      On May 16, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $35.00 in cash for each share of Cray stock they own (the "Merger Consideration").

3.      On June 12, 2019, in order to convince Cray shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. On June 25, 2019, the Company filed a Form DEFM14A Definitive Proxy Statement (the "Proxy") that did not correct the incomplete and misleading nature of the preliminary proxy. The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.      While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Cray shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Cray's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley") in support of its opinion that the Merger Consideration is fair to shareholders on which the Board relied.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Cray shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Cray is incorporated in this District.

## PARTIES

11.      Plaintiff is, and at all relevant times has been, a holder of Cray common stock.

- 3 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

12.     Defendant Cray is incorporated in Washington and maintains its principal executive offices at 901 Fifth Avenue, Suite 1000, Seattle, WA 98164. The Company's common stock trades on the NASDAQ under the ticker symbol "CRAY."

13.     Individual Defendant Stephen C. Kiely is Cray's Chairman and has been a director of Cray since April 2000.

14.     Individual Defendant Peter J. Ungaro is Cray's President, Chief Executive Officer and has been a director of Cray since August 2005.

15.     Individual Defendant Sally G. Narodick has been a director of Cray since October 2004.

16.     Individual Defendant Daniel C. Regis has been a director of Cray since April 2003.

17.     Individual Defendant Dr. Prithviraj Banerjee has been a director of Cray since May 2013.

18.     Individual Defendant Catriona M. Fallon has been a director of Cray since December 2017.

19.     Individual Defendant Brian V. Turner has been a director of Cray since April 2016.

20.     Individual Defendant Max L. Schireson has been a director of Cray since July 2014.

21.     Individual Defendant Stephen E. Gold has been a director of Cray since February 2019.

22.     The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## **CLASS ACTION ALLEGATIONS**

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Cray (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

- 4 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

a.     The Class is so numerous that joinder of all members is impracticable.  As of June 24, 2019, there were approximately 41,000,000 shares of Cray common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of Cray will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

        i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

        ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

        iii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

        iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

- 5 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

## I.      The Proposed Transaction

25.      Cray designs, develops, manufactures, markets and services computer products for high end computing, data analytics, and AI markets. The Company's products include supercomputers, high-performance storage, data analytics, and AI solutions. The products are offered individually, integrated into a complete solution, or hosted in the cloud. Cray's solutions are based on four models: (1) tightly integrated supercomputing designed throughout for scalability and sustained performance; (2) customizable cluster supercomputing based on highest-performance, industry-standard components; (3) robust high-performance storage solutions; and (4) integrated solutions for graph analysis, large-scale analytics, and AI applications.

26.      On May 17, 2019, Cray and HP issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

SAN JOSE, Calif. & SEATTLE--(BUSINESS WIRE)--Hewlett Packard Enterprise (NYSE:HPE) and Cray Inc. (Nasdaq: CRAY), a global supercomputer leader, today announced that the companies have entered into a definitive agreement under which HPE will acquire Cray for $35.00 per share in cash, in a transaction valued at approximately $1.3 billion, net of cash.

"Answers to some of society's most pressing challenges are buried in massive amounts of data," said Antonio Neri, President and CEO, HPE. "Only by processing and analyzing this data will we be able to unlock the answers to critical

- 6 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

challenges across medicine, climate change, space and more. Cray is a global technology leader in supercomputing and shares our deep commitment to innovation. By combining our world-class teams and technology, we will have the opportunity to drive the next generation of high performance computing and play an important part in advancing the way people live and work."

**The Explosion of Data is Driving Strong HPC Growth**

The explosion of data from artificial intelligence, machine learning, and big data analytics and evolving customer needs for data-intensive workloads are driving a significant expansion in HPC.

Over the next three years the HPC segment of the market and associated storage and services is expected to grow from approximately \$28 billion in 2018 to approximately \$35 billion in 2021, a compound annual growth rate[1] of approximately 9 percent. Exascale is a growing segment of overall HPC opportunities and more than \$4 billion of Exascale opportunities are expected to be awarded over the next five years.

Addressing complex challenges and advancing critical academic research, including predicting future weather patterns, delivering breakthrough medical discoveries, and preventing cyber-attacks, requires significant computational capabilities, up to and through Exascale level architecture. Exascale capable systems enable solutions to these problems with much greater precision and insight.

"This is an amazing opportunity to bring together Cray's leading-edge technology and HPE's wide reach and deep product portfolio, providing customers of all sizes with integrated solutions and unique supercomputing technology to address the full spectrum of their data-intensive needs," said Peter Ungaro, President and CEO of Cray. "HPE and Cray share a commitment to customer-centric innovation and a vision to create the global leader for the future of high performance computing and AI. On behalf of the Cray Board of Directors, we are pleased to have reached an agreement that we believe maximizes value and are excited for the opportunities that this unique combination will create for both our employees and our customers."

**Cray is a Leading Innovator in Supercomputer Solutions**

Cray is the premier provider of high-end supercomputing solutions that address customers' most challenging, data-intensive workloads for making critical decisions. Cray has a leadership position in the top 100 supercomputer installations around the globe. With a history tying back to Cray Research, which was founded in 1972, Cray is headquartered in Seattle, Washington, with US-based manufacturing, and approximately 1,300 employees worldwide. The company delivered revenue of \$456 million in its most recent fiscal year, up 16 percent year over year.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

Cray's supercomputing systems, delivered through their current generation XC and CS platforms, and next-generation Shasta series platform, have the ability to handle massive data sets, converged modeling, simulation, AI, and analytics workloads. In addition to supercomputers, they offer high-performance storage, low-latency high performance HPC interconnects, a full HPC system software stack and programming environment, data analytics, and AI solutions – all currently delivered through integrated systems.

Cray recently announced an Exascale supercomputer contract for over $600 million for the U.S. Department of Energy's Oak Ridge National Laboratory. The system, which is targeted to be the world's fastest system, will enable groundbreaking research and AI at unprecedented scale, using Cray's new Shasta system architecture and Slingshot interconnect. The company was also part of an award with Intel for the first U.S. Exascale contract from the U.S. Department of Energy's Argonne National Laboratory, with Cray's portion of the contract valued at over $100 million.

**Cray Strengthens and Expands HPE's High Performance Computing Portfolio**

High performance computing is a key component of HPE's vision and growth strategy and the company currently offers world-class HPC solutions, including HPE Apollo and SGI, to customers worldwide. This portfolio will be further strengthened by leveraging Cray's foundational technologies and adding complementary solutions. The combined company will also reach a broader set of end markets, offering enterprise, academic and government customers a broad range of solutions and deep expertise to solve their most complex problems. Together, HPE and Cray will have enhanced opportunities for growth and the integrated platform, scale and resources to lead the Exascale era of high performance computing.

The combination of HPE and Cray is expected to deliver significant customer benefits including:
- Future HPC-as-a-Service and AI / ML analytics through HPE GreenLake
- A comprehensive end-to-end portfolio of HPC infrastructure – compute, high-performance storage, system interconnects, software and services supplementing existing HPE capabilities to address the full spectrum of customers' data-intensive needs
- Differentiated next-generation technology addressing data intensive workloads
- Increased innovation and technological leadership from leveraging greater scale, combined talent and expanded technology capabilities
- Enhanced supply chain capabilities leveraging US-based manufacturing

**Significant Economic Upside Expected to be Realized from the Combination**

- 8 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

Bringing together HPE and Cray enables an enhanced financial profile for the combined company that includes several revenue growth opportunities and cost synergies.

The companies expect the combination to drive significant revenue growth opportunities by:

- Capitalizing on the growing HPC segment of the market and Exascale opportunities
- Enhancing HPE's customer base with a complementary footprint in federal business and academia and the company's ability to accelerate commercial supercomputing adoption
- Introducing new offerings in AI / ML and HPC-as-a-service with HPE GreenLake

We also expect to deliver significant cost synergies through efficiencies and by leveraging proprietary Cray technology, like the Slingshot interconnect, to lower costs and improve product performance.

**Transaction Details**

As a result of the enhanced financial profiles of the combined companies, the deal is expected to be accretive to HPE non-GAAP operating profit and earnings in the first full year following the close.

As part of the transaction, HPE expects to incur one-time integration costs that will be absorbed within HPE's FY20 free cash flow outlook of $1.9B to $2.1B that remains unchanged.

The transaction is expected to close by the first quarter of HPE's fiscal year 2020, subject to regulatory approvals and other customary closing conditions.

**Investment Community Conference Call**

HPE will conduct a live audio webcast of its conference call to discuss HPE's acquisition of Cray. The call is scheduled for Friday, May 17th, at 8:30 a.m. ET / 5:30 a.m. PT, and the webcast will be available at www.hpe.com/investor/2019Q2HPETOACQUIRECRAY

**HPE Q2 FY19 Earnings Announcement**

As a reminder, Hewlett Packard Enterprise (NYSE: HPE) will conduct a live audio webcast of its conference call to review its financial results for the second quarter of fiscal 2019, which ended April 30, 2019.

The call is scheduled for Thursday, May 23, at 4:30 p.m. ET / 1:30 p.m. PT, and the webcast will be available at www.hpe.com/investor/2019Q2Webcast.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

**About Hewlett Packard Enterprise**

Hewlett Packard Enterprise is a global technology leader focused on developing intelligent solutions that allow customers to capture, analyze and act upon data seamlessly from edge to cloud. HPE enables customers to accelerate business outcomes by driving new business models, creating new customer and employee experiences, and increasing operational efficiency today and into the future.

**About Cray**

Cray Inc. (Nasdaq:CRAY) combines computation and creativity so visionaries can keep asking questions that challenge the limits of possibility. Drawing on more than 45 years of experience, Cray develops the world's most advanced supercomputers, pushing the boundaries of performance, efficiency and scalability. Cray continues to innovate today at the convergence of data and discovery, offering a comprehensive portfolio of supercomputers, high-performance storage, data analytics and artificial intelligence solutions. Go to www.Cray.com for more information.

27.     Cray is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading Proxy

29.     On June 25, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy

- 10 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *The Materially Misleading Sales Process*

30.     According to the *Background of the Merger*, on December 14, 2017, Cray and HP signed a confidentiality agreement that did not include a standstill provision. Proxy 14. The *Background of the Merger* section does not mention that Cray and HP signed another confidentiality agreement, so presumably the December 14, 2017 confidentiality agreement without a standstill agreement was the only confidentiality agreement the parties used during the course of the negotiations.

31.     On April 11, 2019, Cray and Company A entered into a confidentiality agreement that did include a standstill provision which terminated when Cray executed a definitive acquisition agreement with another party or the commencement of a tender offer for 50% or more of Cray's outstanding voting power. *Id.* at 17-18.

32.     The Proxy does not disclose why Company A was required to sign a confidentiality agreement that contained a standstill provision while HP was not. Additionally, the Proxy does not state whether or not Company A was aware of the fact that HP's confidentiality agreement did not contain a standstill provision. The existence of a standstill provision, and other parties' knowledge of whether or not a standstill is in place for all bidders, is material information because it directly relates to the parties ability to make a better offer. Forcing one party to include a standstill provision while allowing another party to be without one in secret shows one bidder is being favored over the other. Without this information, shareholders are unable to determine if the sales process was truly fair, and thereby determine if the Merger Consideration is truly a fair representation of the Company's value.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

*The Materiality of Financial Projections*

33.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses "[o]ur management made available prospective financial information about Cray [] for use in connection with the financial analyses performed by Morgan Stanley with respect to delivering its fairness opinion to our Board. Our management provided the same projections to Morgan Stanley and our Board. A subset of this information was delivered to HP[] to assist with its due diligence review." *Id.* at 31.

34.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

35.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

36.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

(i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated

- 12 -

projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

37.   Here, Cray's shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that in making its recommendation that shareholders vote in favor of the Proposed Transaction, the Board specifically relied on the financial forecasts to determine that "the Merger Agreement and the transactions contemplated thereby are advisable, fair to and in the best interests of Cray and our shareholders." Proxy 21.

38.   As discussed further below, the non-GAAP financial projections here do not provide Cray's shareholders with a materially complete understanding of the assumptions and key factors considered in developing financial projections, which assumptions, factors and other inputs the Board reviewed.

### The Financial Projections Relied on by the Board

39.   The Proxy discloses that the Company's management "made available prospective financial information about Cray [] for use in connection with the financial analyses performed by Morgan Stanley with respect to delivering its fairness opinion to our Board. Our management provided the same projections to Morgan Stanley and our Board." *Id.* at 31.

40.   The Proxy further discloses that the assumptions used in the financial projections were " [i]n the view of our management . . . prepared on a reasonable basis, reflected the best

- 13 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

estimates and judgments available to our management at the time and presented, to the best of our management's knowledge and belief, the expected course of action and our expected future financial performance as of the date such information was prepared." *Id.*

41.     The Proxy goes on to disclose, *inter alia*, forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2019 through 2023 for: (1) EBITDA, (2) EBIT and (3) unlevered free cash flow but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures.  *Id.* at 32-33.

42.     The Proxy defines EBITDA as "earnings before interest income/expense, taxes, and depreciation and amortization. EBITDA is a non-GAAP financial measure and is not intended to represent, or to be used, as a substitute for operating income and net income as a measure of operating performance or for cash flows from operations as a measure of liquidity." *Id.* at 32 n.3. Nevertheless, the Proxy fails to disclose the line items used to calculate EBITDA, rendering the Proxy materially false and/or misleading.  *Id.*

43.     The Proxy defines EBIT as "earnings before interest income/expense and taxes, and is burdened by stock-based compensation expense." *Id.* at 33 n.3. Nevertheless, the Proxy fails to disclose the line items used to calculate EBITDA, rendering the Proxy materially false and/or misleading.  *Id.*

44.     Additionally, the Proxy defines unlevered free cash flow ("UFCF") as "EBIT plus depreciation and amortization, minus taxes and capital expenditures, adjusted for changes in net working capital. Unlevered free cash flow is a non-GAAP financial measure and is not intended to represent, or to be used, as a substitute for operating income and net income as a measure of operating performance or for cash flows from operations as a measure of liquidity." *Id.* at 33 n.4. Nevertheless, the Proxy fails to disclose all of the line items used to calculate UFCF, rendering the Proxy materially false and/or misleading.  *Id.*

- 14 -

45.    Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

46.    The financial projections disclosed on page 32-33 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading, as shareholders are unable to discern the veracity of the financial projections.

47.    As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisor.

***The Financial Projections Violate Regulation G***

48.    The SEC has acknowledged that potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

49.     Defendants must comply with Regulation G.  More specifically, the Company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

50.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Cray included in the Proxy here) implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

---

[4]     SEC, *Final Rule.*

[5]     *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-*

- 16 -

51.     The SEC has required compliance with Regulation G, including reconciliation requirements, in other merger transactions. *Compare Youku Tudou Inc., et al.*, Correspondence 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

52.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into

---

*GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]      *Available at*   https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]      *Available at*   https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

[9]      *Available at*   https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.   Please   revise   to   provide   the   disclosure   required   by   Rule   100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/00000000001 0060087/filename1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/00000000017025180/filename1.pdf.      The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflects the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect. The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.   The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on. *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited July 1, 2019).

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

1  compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP

2  financial measures to their respective most comparable GAAP financial measures.

3  ***The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9***

4       53.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or,

5  at the very least, the line items utilized in calculating the non-GAAP measures renders the financial

6  forecasts disclosed materially misleading as shareholders are unable to understand the differences

7  between the non-GAAP financial measures and their respective most comparable GAAP financial

8  measures. Nor can shareholders compare the Company's financial prospects with similarly

9  situated companies.

10      54.     Such projections are necessary to make the non-GAAP projections included in the

11 Proxy not misleading for the reasons discussed above. Indeed, Defendants acknowledge that

12 "[t]hese non-GAAP financial measures should not be viewed as a substitute for GAAP financial

13 measures, and may be different from non-GAAP financial measures used by other companies.

14 Furthermore, there are limitations inherent in non-GAAP financial measures, because they exclude

15 charges and credits that are required to be included in a GAAP presentation. Accordingly, these

16 non-GAAP financial measures should be considered together with, and not as an alternative to,

17 financial measures prepared in accordance with GAAP."  Proxy 32.

18      55.     Additionally, the Company's presentation of the UFCF projections as a

19 reconciliation is confusing and misleading. The Proxy discloses what appears to be all of the line

20 items going from EBIT to UFCF. *Id.* at 33. However, when following the formula disclosed in

21 footnote 4, none of the calculations add up to the disclosed UFCF values. *Id.* This must mean that

22 either the definition of UFCF is flawed, or one of the line items has been further adjusted and not

23 disclosed. Either way, the Proxy presents the data in the UFCF projections as all that is necessary

24 to calculate UFCF. Clearly, this is not true.

25      56.     As such, financial projections are plainly material, and shareholders would clearly

26 want a complete and non-misleading understanding of those projections.

27                                                                    - 18 -

57.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on page 32-33, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures.

### *The Materially Misleading Financial Analyses*

58.     The summary of the valuation methodologies utilized by Morgan Stanley, including the utilization of certain of the non-GAAP financial projections described above by Morgan Stanley, in connection with its valuation analyses, (*id.* at 25) is misleading in violation of Regulation 14a-9. The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently. Once a proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

59.     With respect to Morgan Stanley's *Discounted Equity Value Analysis*, Morgan Stanley used management's projections to calculate the discounted equity value per share of Cray common stock using calendar year 2023 estimated EBIT and net income. *Id.* at 27. Morgan Stanley used its *Public Trading Comparables Analysis* to select a reference range of 6.0x to 10.0x to Cray's calendar year 2023 EBIT and 7.0x to 11.0x to Cray's calendar year 2023 net income. *Id.* Morgan Stanley then discounted the values using a cost of equity of 9.7% calculated using the capital asset pricing model. *Id.*

60.     The Proxy fails to disclose the *Public Trading Comparables Analysis* information Morgan Stanley references in the *Discounted Equity Value Analysis*. The Proxy only discloses multiples that represent the ratio of aggregate value, defined as the fully diluted market capitalization plus total debt and non-controlling interests, less cash and equivalents, to estimated revenue for calendar year 2020. *Id.* at 26. The Proxy does not disclose any information relating to calendar year 2023 EBIT or calendar year 2023 price to earnings ratios in the *Public Trading Comparables Analysis*.

- 19 -

61.     Additionally, the Proxy fails to disclose any of the inputs that went into Morgan Stanley's calculation of Cray's cost of equity.

62.     The Proxy must disclose the individual multiples for the companies referenced in the *Public Trading Comparables Analysis* and the inputs used to calculate Cray's cost of equity. The absence of the above information renders Morgan Stanley's *Discounted Equity Value Analysis* incomplete and misleading as it appears to substantially undervalue the Company. Thus, unless the information is disclosed, the Company's shareholders are being materially misled regarding the value of the Company.

63.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, Morgan Stanley used the management projections, as modified by two different scenarios, to calculate Cray's UFCF. *Id.* at 27. Morgan Stanley also calculated a range of terminal values by applying perpetuity growth rates ranging from 1.0% to 3.0% to the estimated UFCF at the terminal year and using certain management-provided assumptions. *Id.* Morgan Stanley then discounted the equity values using a discount rate range of 8.7 to 10.7%, based on Cray's weighted average cost of capital, and divided by the number of shares of common stock outstanding and the dilutive securities schedule management provided as of May 10, 2019.

64.     Morgan Stanley's *Discounted Cash Flow Analysis* is misleading because the disclosed calculated UFCF values do not appear to be correct. Morgan Stanley's analysis describes a process by which UFCF was calculated, which is the same as the one described in footnote 4 of the UFCF projections. *Id.* at 27, 33 n.4. However, when using the disclosed line items and following Morgan Stanley's formula, the values do not equal the disclosed UFCF values. It is unclear exactly why the numbers are different, but whatever the reason, the failure to provide accurate values makes Morgan Stanley's *Discounted Cash Flow Analysis* misleading.

65.     Additionally, the Proxy fails to disclose the inputs and assumptions that went into the selection of the perpetuity growth rates, the inputs and assumptions that were used to calculate

- 20 -

Cray's weighted average cost of capital, how stock based compensation was treated, the number of common stock outstanding and the dilutive securities schedule provided to Morgan Stanley.

66.     Since information was omitted, shareholders are unable to discern the veracity of Morgan Stanley's *Discounted Cash Flow Analysis*. Without further disclosure, shareholders are unable to compare Morgan Stanley's calculations with the Company's financial projections. The absence of any single piece of the above information renders Morgan Stanley's *Discounted Cash Flow Analysis* incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

67.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . " *Id*.  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

68.     Therefore, in order for Cray shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

69.     With respect to Morgan Stanley's *Premiums Paid Analysis*, the Proxy fails to disclose which transactions Morgan Stanley analyzed and their closing prices.

- 21 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

70.     With respect to Morgan Stanley's *Equity Research Analysts' Price Target Analysis*, the Proxy fails to identify the individual price targets and identify their sources.

71.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Cray shareholders.

72.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

73.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## <u>COUNT I</u>

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

1    national securities exchange or otherwise, in contravention of such rules and regulations as the

2    Commission may prescribe as necessary or appropriate in the public interest or for the protection

3    of investors, to solicit or to permit the use of his name to solicit any proxy or consent or

4    authorization in respect of any security (other than an exempted security) registered pursuant to

5    section 78l of this title."  15 U.S.C. § 78n(a)(1).

6        76.     As set forth above, the Proxy omits information required by SEC Regulation G, 17

7    C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other

8    things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation

9    of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other

10   clearly understandable method" of the non-GAAP measure to the "most directly comparable"

11   GAAP measure.  17 C.F.R. § 244.100(a).

12       77.     The failure to reconcile the non-GAAP financial measures included in the Proxy

13   violates Regulation G and constitutes a violation of Section 14(a).

14       78.     As a direct and proximate result of the dissemination of the false and/or misleading

15   Proxy Defendants used to recommend that shareholders approve the Proposed Transaction,

16   Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between

17   the value they will receive as a result of the Proposed Transaction and the true value of their shares

18   prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief

19   as the Court deems appropriate, including rescissory damages.

20                                          **<u>COUNT II</u>**

21   **(Against All Defendants for Violations of Section 14(a) of the Exchange Act and

22                     Rule 14a-9 Promulgated Thereunder)**

23       79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

24   herein.

25       80.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration

26   statements that contain "any statement which, at the time and in the light of the circumstances

27                                              - 23 -

28

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

81.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

82.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

83.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

84.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

85.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

86.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

87.     Cray is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

88.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

89.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

- 25 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

# COUNT III

### (Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act)

90.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.     The Individual Defendants acted as controlling persons of Cray within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Cray, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

92.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

93.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

94.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants

- 26 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

95.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

96.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

Dated:  July 2, 2019

Respectfully submitted,

TERRELL MARSHALL LAW GROUP PLLC

By: _/s/ Beth E. Terrell, WSBA # 26759_____
    Beth E. Terrell, WSBA #26759
    Email: bterrell@terrellmarshall.com
    936 North 34th Street, Suite 300
    Seattle, Washington 98103
    Telephone: (206) 816-6603
    Facsimile: (206) 319-5450

    Nadeem Faruqi
    Email: nfaruqi@faruqilaw.com
    James M. Wilson, Jr.
    Email: jwilson@faruqilaw.com
    FARUQI & FARUQI, LLP
    685 Third Avenue, 26th Floor
    New York, NY 10017
    Tel.: (212) 983-9330
    Fax: (212) 983-9331

    *Attorneys for Plaintiff*

- 28 -

CLASS ACTION COMPLAINT FOR
VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Michael Epstein ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed a draft complaint against Cray Inc. ("Cray") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2. Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3. Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5. Plaintiff's transactions in Cray securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6. In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7. Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 28th day of June, 2019.

Michael Epstein

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 04/25/18 | 350 |
|  |  |  |
|  |  |  |